## ANDERSEN v. UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF VIRGINIA.

No. 583. Argued April 11, 1898. — Decided May 9, 1898.

The indictment in this case, which is set forth at length in the statement of the case, alleged the murder to have been committed " on the high seas, and within the jurisdiction of this court, and within the admiralty and maritime jurisdiction of the said United States of America, and out of the jurisdiction of any particular State of the said United States of

America, in and on board of a certain American vessel:" *Held*, that nothing more was required to show the locality of the offence.

The indictment was claimed to be demurrable because it charged the homicide to have been caused by shooting and drowning, means inconsistent with each other, and not of the same species. *Held*. that the indictment was sufficient, and was not objectionable on the ground of duplicity or uncertainty.

There was no irregularity in summoning and empanelling the jury.

There was no error in permitting the builder of the vessel on which the crime was alleged to have taken place, to testify as to its general character and situation.

As there was nothing to indicate that antecedent conduct of the captain, an account of which was offered in evidence, was so connected with the killing of the mate as to form part of the *res gestæ*, or that it could have any legitimate tendency to justify, excuse or mitigate the crime for the commission of which he was on trial, there was no error in excluding the evidence relating to it.

After the Government had closed its case in chief, defendant's counsel moved that a verdict of not guilty be directed, because the indictment charged that the mate met his death by drowning, whereas the proof showed that his death resulted from the pistol shots. *Held*, that there was no error in denying this motion.

While a homicide, committed in actual defence of life or limb, is excusable if it appear that the slayer was acting under a reasonable belief that he was in imminent danger of death or great bodily harm from the deceased, and that his act was necessary in order to avoid death or harm, where there is manifestly no adequate or reasonable ground for such belief, or the slayer brings on the difficulty for the purpose of killing the deceased, or violation of law on his part is the reason of his expectation of an attack, the plea of self-defence cannot avail.

The evidence offered as to the general reputation of the captain was properly excluded.

As the testimony of the accused did not develop the existence of any facts which operated in law to reduce the crime from murder to manslaughter, there was no error in instructing the jury to that effect.

ANDERSEN was indicted in the Circuit Court of the United States for the Eastern District of Virginia, for the murder of William Wallace Saunders, on an American vessel, on the high seas, of which vessel Saunders was the mate and Andersen the cook.

The indictment charged that Andersen —

" On the sixth day of August, in the year of our Lord one thousand eight hundred and ninety-seven, with force and arms, on the high seas and within the jurisdiction of this court and

within the admiralty and maritime jurisdiction of the said United States of America, and out of the jurisdiction of any particular State of the said United States of America, in and on board of a certain American vessel, the same being then and there a schooner called and named 'Olive Pecker,' then and there belonging to a citizen or citizens of the said United States of America whose name or names is or are to the grand jurors aforesaid unknown, in and upon one William Wallace Saunders, sometimes called William Saunders, then and there being on board said vessel, did piratically, wilfully, feloniously and of his malice aforethought make an assault, and that the said John Andersen, alias John Anderson, a certain pistol then and there charged with gunpowder and leaden bullets, which said pistol he, the said John Andersen, alias John Anderson, in his hand (but which hand is to the said jurors unknown) then and there had and held, then and there piratically, feloniously, wilfully and of his malice aforethought did discharge and shoot off to, against and upon the said William Wallace Saunders, sometimes called William Saunders, with intent him, the said William Wallace Saunders, sometimes called William Saunders, then and there to kill and murder, and that the said John Andersen, alias John Anderson, with the leaden bullets aforesaid out of the pistol by the said John Andersen, alias John Anderson, discharged and shot off as aforesaid, then, to wit: On the said sixth day of August, in the year of our Lord one thousand eight hundred and ninety-seven, and there, to wit: On the high seas as aforesaid, in and on board of the said American vessel, and within the admiralty and maritime jurisdiction of the said United States of America and within the jurisdiction of this court, and out of the jurisdiction of any particular State of the United States of America, piratically, feloniously, wilfully and of his malice aforethought did strike, penetrate and wound the said William Wallace Saunders, sometimes called William Saunders, in and upon the head of him, the said William Wallace Saunders, sometimes called William Saunders, (and in and upon other parts of the body of him, the said William Wallace Saunders, sometimes called William Saunders,

to the said jurors unknown,) giving to him, the said William Wallace Saunders, sometimes called William Saunders, then and there, with the leaden bullets aforesaid, so as aforesaid discharged and shot off out of the pistol aforesaid by the said John Andersen, alias John Anderson, with the intent aforesaid, in and upon the head of him, the said William Wallace Saunders, sometimes called William Saunders, (and in and upon other parts of the body of him, the said William Wallace Saunders, sometimes called William Saunders, to the said jurors unknown,) several grievous, dangerous and mortal wounds, and the said John Andersen, alias John Anderson, did then and there, to wit: At the time and place last above mentioned, him, the said William Wallace Saunders, sometimes called William Saunders, piratically, feloniously, wilfully and of his malice aforethought cast and throw from and out of the said vessel into the sea, and plunge, sink and drown him, the said William Wallace Saunders, sometimes called William Saunders, in the sea aforesaid, of which said mortal wounds, casting, throwing, plunging, sinking and drowning the said William Wallace Saunders, sometimes called William Saunders, in and upon the high seas aforesaid, out of the jurisdiction of any particular State of the United States of America, then and there instantly died.

"And the grand jurors·aforesaid, upon their oath aforesaid, do say that by reason of the casting and throwing of the said William Wallace Saunders, sometimes called William Saunders, in the sea as aforesaid, they cannot describe the said mortal wounds with greater particularity."

The case coming on before Goff, Circuit Judge, and Hughes, District Judge, defendant "demurred to the said indictment on the ground that it does not specify the locality on the high seas where the alleged offence occurred, and for other reasons not assigned. Thereupon the United States joined in said demurrer as to the said cause so assigned and objected to the said demurrer being in anywise considered, for reasons not assigned. Whereupon, after argument, the court overruled the said demurrer for the cause assigned as aforesaid and admonished the accused that he must state any

other grounds of demurrer on which he relied, as the court could not otherwise consider them. No other grounds being alleged by the accused, the said demurrer was overruled."

Defendant was duly and formally arraigned and pleaded not guilty; and then "moved to quash the writ of *venire facias* for the petit jury to be used in the trial of this particular case, on the ground that the said writ must show that said venire were summoned for the trial of this particular case, and not the general venire for offences in general to be tried at this term of the Circuit Court of the United States for the Eastern District of Virginia." This motion was overruled and defendant excepted.

A jury was thereupon duly empanelled and sworn and the trial proceeded with, and during its progress exceptions to the admission and exclusion of evidence and the giving and refusal of instructions were preserved by defendant. At the close of the Government's case in chief, defendant's counsel moved the court to instruct the jury to bring in a verdict of "not guilty" on the ground that defendant was indicted for the murder of Saunders by drowning, whereas the evidence showed that he met his death by the discharge of a pistol. The court overruled the motion and defendant excepted. A verdict of guilty having been returned, defendant made successive motions for a new trial and in arrest of judgment, which were severally overruled, whereupon he was sentenced to be executed. This writ of error was then sued out, the cause docketed, and duly argued at the bar.

The bill of exceptions contained the following preliminary statement of uncontroverted facts:

"That the American three-masted schooner 'Olive Pecker' sailed from Boston, Massachusetts, on the 20th day of June, 1897, for Buenos Ayres, South America, with a cargo of lumber under and on deck. She had on board a captain, J. W. Whitman; a mate, William Wallace Saunders, sometimes called William Saunders; an engineer of a donkey engine, William Horsburgh; a cook, viz., the defendant, John Andersen, and four seamen, viz., Martin Barstad, a native of Norway; John Lind, a native of Sweden; Juan de Dios

Barrial, a native of Spain, and Andrew March, a native of Newfoundland; that the said 'Olive Pecker' was an American vessel, belonging to citizens of the United States; that the said vessel proceeded from Boston on her course to her port of destination until the morning of August 6, 1897, when, on the high seas and about 100 or 150 miles off the Brazilian coast, between nine and ten o'clock on that morning, the captain, Whitman, was shot in his cabin, and shortly thereafter the mate was shot on the left-hand side of the forecastle head and his body immediately thrown into the sea. The body of the captain was also thrown into the sea. Several hours thereafter the said vessel ' Olive Pecker' was burned and the cook, engineer and four seamen took to the sea in an open boat. Twenty-eight or thirty hours thereafter they reached the Brazilian coast, where, having spent the night on shore, they separated the next morning, the accused and John Lind going in a northerly direction and the other four going in a southerly direction. That the accused and Lind, within a few days, reached Bahia, in Brazil. Both shipped, the accused on a vessel called the ' Bernadotte,' bound for Pensacola, in the United States, and Lind on a Brazilian barkentine, bound for some point in Spain. The other four men, having the Spaniard as their spokesman, he being familiar with the language of the country, and not finding an American consul, made known to the Brazilian authorities what had transpired on the ' Olive Pecker,' with the request that telegrams be sent along the coast for the arrest of the accused, John Andersen. These four men, having secured passes on a vessel to Bahia, arrived there several days after the arrest of the accused, and were placed in charge of the American consul at that port. The accused handed to the American consul a statement in his own handwriting, purporting to be an account of the voyage of the ' Olive Pecker,' and also made to the American consul a sworn statement, as did also the other five men, which said statements were duly transmitted to the Department of State at Washington, and upon the call of defendant's counsel were produced for his use at the trial, but were not produced in evidence.

" At the direction of the Government at Washington, the American consul at Bahia kept the accused and the five men in custody at Bahia until the arrival at that port some time in the month of September, 1897, of the United States man-of-war.' Lancaster,' when they were put on board of that vessel and brought into Hampton Roads, Virginia, in the Eastern District of Virginia, that being the first district into which the accused was brought after the commission of the alleged offence; and the said accused, together with the five men, was turned over by the officers of the 'Lancaster' to the United States marshal on the 7th day of November, 1897, and were duly placed in confinement in the city jail at Norfolk, Virginia."

The evidence introduced on the trial was given in full, and included the testimony of the four seamen, Barstad, Lind, Barrial and March, and the engineer. Horsburgh, on behalf of the Government, and that of the defendant on his own behalf. A considerable portion is set forth in the margin.[1]

---

[1] Barstad, who was at the wheel when the mate was shot, testified:

" I last saw William. Saunders, the mate of the said vessel, alive on the morning of August the 6th, 1897, on the left side of the forecastle head of that vessel. It was between nine and ten o'clock of that morning. He was shot at that time and place by John Andersen, the cook of the vessel and the prisoner here. I saw him shoot him. I was at the wheel of the vessel in the wheelhouse, just aft of the after-cabin.

" I heard a report of a shot in the captain's cabin, which was connected with the wheelhouse by the after companionway. Immediately after I saw John Andersen, the accused, come running up the after companionway and through the wheelhouse, with a pistol in each hand and one in his hip pocket. He ran up to John Lind, who was standing amidships by the rigging of the middle mast. He said something to Lind, but I did not hear what it was. I heard him sing out to the mate, Saunders, who was up on the cross-tree of the foremast, at work in the rigging, and say, ' Come down, Mr. Saunders.' The mate said, ' What do you want, steward?' In a little while the mate finished the job and started down the rigging. When about midway down, and when the cook, Andersen, was standing on top of the forward house, the mate started down and said, ' What you got in your hands, cook?' ' I got guns,' he says. ' Where you get them?' says the mate. ' Down in the cabin,' he says. The mate came down and stepped on the forecastle head, not on the forecastle house. Then Andersen fired a shot. The mate reeled and faced him, and said, ' For God's sake don't shoot me, cook.' The

*Mr. George McIntosh* for plaintiff in error.

*Mr. Solicitor General* and *Mr. William H. White* for defendants in error.

---

cook fired another shot, and the mate kept on reeling; and the cook fired another one, and a third one, when the mate fell, and he shot him once after he had fallen. Then the cook sung out to the men, who were in the forecastle, 'I am in charge of this vessel; I am next. to the mate.' He sung out again, 'Won't you fellows come out?' They came out, and I saw them throw the mate's body overboard. I was at the wheel all the time. Then he marched. the whole gang aft and went down in the cabin and brought the captain up and threw him overboard. He then said, 'If any man like he can put me in irons.' He had two or three pistols, one in his hands then. He had said he was in charge of the vessel and had ordered the men to throw the mate and captain overboard. I was at the wheel all the time. Then he says, 'Boys, come down and have a drink.' He went down in the captain's cabin and handed a bottle of whiskey, about two parts full. He gave each a drink and took one himself. Then he marched the whole gang up on deck, just outside the door of the wheelhouse, and said, 'You know all you men is guilty for helping me throw the bodies over the side.'

"The Spaniard told him to keep the vessel off, to clew up the gaff topsails and jibs, the outer jib, and make for port. The cook said, 'Damn; you want me to get hung.' We said, 'No, steward, we don't want you to get hung.' All the time he was armed. After a little he said to the Spaniard, 'You the only sensible man amongst the crowd; I want to speak to you.' Then he called John Lind afterwards and spoke to him. I don't know what he said. He ordered the men to do so and so. I left the wheel and went to the forecastle. The rest of the men came forward to get their clothes. He ordered us to get our best clothes, and no more; he said take no discharges, bank books, nothing. He ordered the men down in the booby hatch to get up a barrel addressed to the American consul at Buenos Ayres. Then he told me to go down in the galley to tap some paraffine oil. I said 'No.' He says, 'You go,' and handed his pistol in my face. 'All right,' I says, 'steward.' I filled three buckets and passed them up, and Andrew March took it and threw it on the deck-load. He was standing there armed all the time. Then he, the cook, ordered me to take the wheel. I went. The first fire commenced at the booby hatch; the next was forward. The boat was lowered and provisions put in it." . . . "It was twelve or one o'clock when we left the 'Olive Pecker.' No vessels were in sight which could have picked up the bodies of the mate and captain."

He then gave the particulars of the sail to the shore; the arrest; etc.

This witness further said that when Andersen called to Saunders to come down —

"The mate asked him, 'What do you want, steward?' He finished his job and hung the marlin spike around his neck and came down the rigging.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

1. The cause assigned in support of the demurrer to the indictment was that it did "not specify the locality on the

---

The marlin spike had a half hitch on the point, which put the point upwards. That is the way sailors do it to keep the point from striking them as they go up and down the rigging.

"There was nothing to keep me from seeing the mate in the rigging and when he came down, and all along the vessel on her port side to where the shooting occurred. The sails were all swinging to starboard. The lumber was so piled on the deck that a man running along on it would run right on top of the forward house. John Andersen was standing on top of the forward house when he shot the mate, and the mate was standing on the forecastle deck. The forecastle deck is about three feet lower than the top of the house where the cook was standing. The body of the mate was lying, when picked up, on the forecastle head, on the left side of the vessel."

On cross-examination he said: "I mean to tell the jury that five of us were intimidated by that one man, the cook — the cook with the pistols. He intimidated us so that when he ordered us to burn the ship we obeyed. He was following us up all the time. He ordered one to go there and another to go there, and another one there. We had to follow the man at the point of the pistol or else get killed. We did what we were told to do through his pistol." . . . "When the mate came down out of the rigging, he asked the cook, 'What have you got in your hands, steward?' The steward said, 'I got guns.' The mate came down, stepped on the forecastle head, and John Andersen fired a shot. The marlin spike was not in the mate's hand, but was hanging around his neck, with the point up. I am sure of that, though I was a hundred and fifty feet away. I did not have a glass. The mate was standing with his hands at his side, with the marlin spike around his neck. He did not make any hostile demonstration towards the cook. He did not come at him to strike him. I am positive of that. I do not know the mate had threatened the cook's life."

Lind testified:

"I last saw Mate William Saunders on the 6th of August of this year; he was killed that morning by John Andersen on the forecastle head, on the left or port side thereof. I saw Andersen just before the shooting of the mate that morning, coming up from the cabin through the after companionway and through the wheelhouse; I was standing amidships; he came up with a revolver in each hand; he came right up to me and asked me where the mate was, and said, 'I have killed the captain, and now the mate goes too.' The mate was then aloft, in the rigging of the foremast. I went then down on the lee or starboard side of the vessel to the forecastle house; I went and called the watch below in the forecastle house. I said, 'You better look out because the cook is on deck with revolvers.'

high seas where the alleged offence occurred." The objec-
tion was without merit. The indictment alleged the murder
to have been committed " on the high seas and within the
jurisdiction of this court, and within the admiralty and mari-

---

As I was calling through the window I could not see on the left of the ves-
sel. While I was calling to the men I heard a shot on the port side, on the
forecastle head. I heard three or four shots, I don't know exactly how
many. I heard the steward call to the men to come out, for all of them to
come up there. He was calling the men in the forecastle house. He said
he wanted us to throw the body overboard. When I came up, all hands
were there except the man at the wheel, Martin Barstad. The mate was
lying on the forecastle head with his face downward. He had a marlin
spike tied around his neck. A marlin spike is used for splicing ropes, an
instrument that all sailors carry aloft when they go up to splice a rope; it
is carried around the neck by a long lanyard and a half hitch on the point
to keep it from sticking in his legs. We threw the body overboard. Then
the cook told us to come aft and get the captain's body overboard. We
went in the after cabin and found the captain sitting in his chair; sitting
like this, sir, with his hands folded in his lap. He looked as if he was
alive. I saw blood on the side of his head, on the left side. We were told
to take him up by Andersen; he helped. He was taken up and thrown
overboard. Andersen was armed all this time. Before throwing the cap-
tain's body overboard, Andersen took hold of the captain's arm and felt his
pulse. When the body was thrown overboard, Andersen cursed it. The
captain's body was sitting in a chair in the after cabin, near the sofa on the
starboard side of the cabin. He was facing forward. I had only been in
the cabin once before, when we were in Boston. On American vessels
seamen do not go in the captain's cabin unless they are sent or called there.
There are doors opening from the forward cabin into the after cabin and
from the mate's room into these cabins.

" After the captain's body was thrown overboard, Andersen told us to go
down and he would give us a drink. We went down in the cabin, in the
forward cabin where the dining-room table was, and got a drink. I don't
recollect whether Andersen drank with us or not. There was not much
liquor in the bottle, a little over half a bottle I think, not enough to make
any one drunk. I didn't see any one drunk. After taking a drink, we went
up on deck and talked about making the small sails fast. The Spaniard and
myself suggested that the small sails be made fast and to make for land.
This was not done. Andersen said, 'No, keep her up to her course,' — she
was off a little. 'Keep her up to her course,' he said; 'you want me to be
hanged ?' He then said to the Spaniard, 'You are about the sensiblest
man; I want to speak to you.' I did not hear what he said to him. He
then called me. I went to the lee side of the wheelhouse and he asked me
what I thought was best to do with the vessel. I said, ' The only thing we
can do now is to try to make for some land.' He said, ' No, nothing is go-

time jurisdiction of the said United States of America, and out of the jurisdiction of any particular State of the said United States of America, in and on board of a certain American vessel, . . ." Nothing more was required to

---

ing to be done but to destroy the vessel.' He did not say anything more to me after that. If he spoke to any of the rest, I didn't see or hear it. He then ordered everything to make ready for to leave the ship. The old boat sail was all tore up and I started to patch that; I was engaged about it about an hour I should think. He then gave orders to lower the boat. Me and the Spaniard lowered the boat. It was the big boat you see hanging at the stern in the picture. Me and the Spaniard did lower the boat and Andrew March went down and unhooked the tackle, and we hauled the boat up alongside the vessel and got some provisions down there. Then the cook called Andrew and he went up. After I was through with that I went up on the house again and I saw flames coming out of the after hatch. She was afire then. Then they all went down in the boat and all hands cut the boat adrift, rigged up the mast and started to sail. The cook helped us to rig up the mast and sail. He was armed all that time with pistols. I do not think any other members of the crew had pistols. I did not see any of them have pistols." . . . "There were no vessels sighted after the bodies of the captain and mate were thrown overboard which could possibly have picked up the bodies."

On cross-examination this witness gave an account of a difficulty between the cook and the captain that morning about the captain's dog. About eight o'clock the captain's dog was down by the galley door and the cook threw some water on him. The dog ran up on the deck load "hollering." The captain came up and said to the cook, "Did you throw hot water on that dog?" Andersen replied that he did not throw hot water on him; that it was cold. The captain felt the dog's back and then called the cook a liar, cursed him and struck him. Lind did not see the captain strike the cook but heard the noise in the galley. Shortly after this the cook appealed to the mate, "Won't you protect me until we get to port?" To this the mate replied, "Get to port! You will get killed anyhow," or something like that. "'Go to hell—you will get killed anyhow,' or something like that."

March testified:

"After the shooting the cook came and called us out of the forecastle. He says, 'Come out here, boys, lower the boat and put me ashore. The captain and mate is dead and I am in charge of this ship.' I got out of the bed and put on my shoes in a hurry, and the cook came back a second time and says, 'Come out here, won't you? Come out here, Manuel,' and he says, 'Yes.' We went out and went on the topgallant forecastle, and he ordered us to throw the mate overboard. The mate was lying on the forecastle head, on the left-hand side. The sails of the vessel were swinging at that time to the starboard, which left the left-hand side of the vessel clear back to the wheelhouse. The cook was armed when he ordered the

show the locality of the offence. *St.· Clair* v. *United States,* · 154 U. S. 134; 144. But the point is now made that the indictment was demurrable because it charged the homicide to have been caused by shooting and drowning, which are means

mate's body to be thrown overboard, and he claimed then to be in charge of the vessel. I do not remember whether he caught hold of the mate's body and helped to throw it overboard or not. The mate had a marlin spike tied around his neck when the body was throw overboard. · A marlin spike is a big awl used to stick through the rope in splicing it. When it is used by a man going up and down the rigging a half hitch is taken over the point so it won't stick in his legs or get between the rigging going down. When it is around the man's neck it is tied with a string and with a half hitch on the point. He can't use it without taking the hitch off so as to hurt anybody with it. The top of the forecastle house, where the cook was standing when he shot the mate, is about three feet higher than the forecastle deck, where the mate was standing when he was shot. To get to where Andersen was when he was shot, the mate would have had to step up those three feet on top of the forecastle house." , . . "I couldn't say whether the half hitch was around the point or not.

"After the mate's body was thrown overboard we were ordered to the cabin to take the captain up and throw him overboard. The cook was armed at that time. When the mate's body was thrown overboard Andersen swore oaths at it. When he swore oaths at the body the Spaniard asked him not to curse the body that way. We all obeyed the cook and went aft and found the captain's body in the after cabin. (Here the witness identified the diagram, showing the inside of the after cabin, and marked number two.) · The captain's body was found sitting in his chair, dead, with both arms folded in his lap. He looked as if he was alive, with his head back on one side and a wound in the left part of his head, about an inch above the left ear.· The captain was sitting in his chair near the sofa, on the starboard side of the vessel, the point marked on the ·diagram ·'A.' John Andersen ordered the captain's body to be taken up and thrown overboard. Andersen was at that time armed. He assisted in throwing the body overboard. He swore at it when the body was thrown into the sea, calling it 'a mean bastard.' After the body of the captain was thrown overboard the steward ordered us to get ready the boat. He then invited us down into the cabin to get a drink of whiskey. There was about two thirds of a bottle of whiskey. He drank with us. After that was done the boat was got ready. Kerosene oil was thrown over the deck load and the ship was set on fire. Then we made for land in the sail boat. It was about two hours, I think, after the bodies were thrown overboard before we left the 'Olive Pecker.' At the time these bodies were thrown overboard there was no vessel in sight which could possibly have picked them up."

\* \* \* \* \* \* \*

"That morning before the captain was shot and before the mate was

contended to be inconsistent in themselves and not of the same species. This ground of demurrer was not brought forward in the Circuit Court, although defendant was admonished that he must state all the grounds on which he relied. But, treating

---

shot I heard a difficulty between the cook and the captain about the captain's dog. As I was going forward from taking my dishes back from my breakfast, I heard the dog holler. I was standing on the forecastle house. I saw the dog come out and run aft. The captain came out and went to the galley and asked the cook if he had been throwing water on the dog, and he said no. The captain went back and felt the dog. Then I saw the captain go in the galley, but I did not know what he did there. This was about fifteen or twenty minutes, I think, before the captain was shot. I had been at the wheel of the 'Olive Pecker' many times. While standing at the wheel, in the wheelhouse, looking forward, with the sails swinging to the right or starboard side of the vessel, you can see all the way along the left-hand side of the ship, on top the forecastle house, or a man standing on top the forecastle house. The deck load did not interfere with seeing that."

On cross-examination: "I say this man intimidated us all at the pistol's point. He ordered us to throw the mate overboard. I obeyed his orders, because I wanted my life a little longer. After the captain was thrown overboard, we all went into the cabin and took a drink. I can't say that we took a drink at the pistol's point, but he made us throw the mate's body overboard. He did not tell me he would kill me if I did not, but I knew enough to know he would do it. There were four of us altogether. I did not have a knife. I do not know whether I went ahead or who went ahead when we went into the cabin to take a drink. We had to throw the body of the captain overboard because the cook ordered us to do it. I took orders from the cook because he gave me to understand he was in charge of the ship. At the time I knew he was, because he had all the guns. It makes a big difference when he had all the arms."

Barrial testified:

"I last saw Mate Saunders alive on board that vessel on the morning of the 6th of August, 1897, when the vessel was about a hundred or a hundred and fifty miles off the Brazilian coast. On that morning I left the wheel of the vessel about 8 o'clock, being relieved by Martin Barstad, and went after my breakfast; then went to the forecastle and to my cabin. While I was lying down, after that — I do not know how long — I heard the captain's dog holler. Andrew March came in the forecastle and says, 'The captain is having a racket with the cook,' and I says, 'What can we do? Let him racket,' says I, and it was a little while before John Lind came and knocked at the window where I was sleeping. When he finished talking to me I heard the report of four shots. I went in the forecastle in a narrow place between the engine room and my bunk. I went in there because I thought the cook wanted to kill us too. The engineer jumped on my bunk and got out, too. I heard the cook sing out in the door,

it as open to consideration, we think the indictment was
clearly sufficient as ruled in effect in *St. Clair's case.*

In that case, defendant was charged with the murder of
Fitzgerald on board the bark Hesper on the high seas, by

' Come out here, boys! Come out here quick!' ' Yes, sir,' says I, 'let
me finish dressing.' He says, ' Come out here. I am in charge of the
vessel.' I went out and the first thing I saw was the mate lying on the top
of the forecastle deck on the left-hand side, with his face downwards. The
cook says, ' Throw him overboard,' and then I says, ' Don't, cook; don't
throw him overboard, he's alive.' He says, ' Throw him overboard; he's
dead enough.' We threw him overboard, and after we threw him over-
board the cook says, ' Now go aft and pick the captain up.' When he
threw the body overboard he cursed at the body. Then he ordered the men
aft to throw the captain overboard. All the while he was armed with
pistols.' We went under his orders and into the captain's cabin. When
we got in the cabin we saw the captain sitting in his chair with both hands
in his lap, and his head leaning slightly to one side and on his breast. I
thought he was alive. I saw he had a bullet to go through near the left
side of his head. His body was taken up and thrown overboard. When
his body was thrown overboard, the cook cursed it also. After it was
thrown over he said, ' Come on, boys, I will give you a drink.' We took
a drink, and after we took a drink all came on deck and I said, ' We will
make the staysails and the topsails fast and if a squall strikes her we can
manage the other sails, and we go right into Rio de Janeiro or Bahia.' I
sung out to Martin Barstad at the wheel, ' Keep her off,' and the cook says,
' No, I don't want to go to the land.' He was standing close to the rail.
And he said, ' Do you want me to be hung? There is nothing to be done
but destroy the vessel,' he said. Then he called me and said to me, ' You
are the sensiblest man on board this vessel, and I want to speak to you.'
' All right, cook,' I says. He took me on top the galley and says, ' I am a
murderer, and I killed these people to save my life and your lives. Now,
you fellows,' he says, ' you are guilty of helping me throw the bodies over-
board, and before you leave the vessel you will be as guilty as I am. You
ain't got nothing to fear.' Says he, ' Many a vessel leaves port and they
don't know where they go, and there's nobody to look after us for a long,
long time, and we will have time to run away.' I told him I had nothing
to fear with the vessel in port. I says, ' Look here, cook, destroy the
vessel, it's a terrible thing, it's worse than what you have done already.
Call all hands here and tell us what you want to do and where you want us
to sail ashore, and we will help you as much as we can, and let us go into
port.' ' No, no,' he says, ' that won't do; the vessel must be burned.' He
ordered a small boat to be made ready, and everything was made ready and
then he took us down into the cabin and he says, ' I didn't kill these
people to rob the vessel. I grant you all fellows clothes out of this large
chest,' and we went in and everybody took some clothes, and the cook says,

striking and beating him with a weapon unknown, and thereby giving him "several grievous, dangerous and mortal wounds," and then and there casting and throwing him from the vessel into the sea, and drowning him, "of which said

---

'You fellows can put on your best clothes,' and he gave me a suit of clothes, and he says, 'You don't want to take anything;' so we went forward and put on our best suit of clothes, and the cook had us to pour oil on the deck. The cook called us to hurry up and spread the oil on the deck. I didn't want to do this. I went to the forecastle and the cook came and said, 'What are you doing there? Come and give your hand with this oil.' I says, 'Yes, cook; let me finish shaving and I go.' When I went on deck I could see that the oil was already. It had been spread over the deck. The cook then told us to lower a boat and it was lowered, and Andrew March unhooked the tackle and we took the boat alongside the vessel and I jumped in too. Provisions were then put in the boat and when everything was ready Andersen called to me, 'Come up and light the fire.' 'Well,' I says, 'let me keep the lookout on the boat; it might smash against the vessel.' So he called Andrew March, and the first time he called Andrew he did not come, so he called him again in wild words and March went up."

On cross-examination: "Q. After the cook here had killed the mate, didn't he tell you you might put him in irons? A. Yes, sir; he came and he says, 'Now you fellows can put me in irons and carry me to port, if you want.' Q. And give me to the American consul? A. No, sir; the same words I told you, sir. 'Now you fellows,' he says, 'can put me in irons and take me in port if you want.' I says, 'No, no, cook, I no put you in irons,' because he looked right in my face; and I says, 'Why don't you throw your revolvers away?' Q. He offered to give himself up to you, holding out his hands, and said: 'Put me in irons?' A. He didn't throw his revolvers away. Q. He didn't? A. No, he didn't. Q. Did he hold out his hands to put him in irons? A. With his revolvers, yes; and I says, 'No, no, cook, I won't put you in irons; no, no.' Q. Do you mean to say he had the revolvers in his hands when he offered you to put him in irons? A. Yes, sir."

Horsburgh was asleep in his berth in the after cabin when the captain was shot. What he supposed was the noise of the shooting of the captain awakened him, and then Andersen came to the companionway and asked him to come on deck, that he had killed the captain. He came on deck and went aft along the starboard side, where he told the crew that the cook had killed the captain. Directly after the shots, the cook came forward, shouting, "Come out, boys: I am in charge of the vessel," and ordered the mate's body to be thrown overboard. The mate was lying with his face down on the port side of the forecastle head, with a marlin spike hanging about his neck. After the mate's body was thrown overboard, the cook ordered them to go aft and throw the captain's body overboard. "We went down in the

mortal wounds, casting, throwing, plunging, sinking and drowning," Fitzgerald "then and there instantly died." The language used was much the same as that employed in *United States* v. *Holmes*, 5 Wheat. 412. The indictment was sus-

cabin and found the captain in the chair, so we took him up on deck and threw him overboard. Then after that he told us to go down and he would give us a drink; so we went down in the cabin and had a drink." After that the cook ordered them to get the boat ready with provisions, etc. The cook was armed and witness was frightened. The burning of the vessel and the escape in the open boat as told by this witness corresponded with that of the others. On the cross-examination the difficulty between the captain and the cook about the captain's dog was reiterated.

Defendant Andersen testified in his own behalf:

"It was just after breakfast, and the dog was standing at the galley door. He used to keep himself around there all the time. The captain didn't want him to stay at the galley door, and I took some water I had left in a bucket, some dirty water, to throw it onto the dog, as I always used to throw some water on him, and he used to run and holler. I took the bucket, and there was a little water left at the bottom of it. He was standing right at the door and I had been giving him his breakfast. As the dog turned the bucket slipped in my hand. I had the handle on the edge of it, and it hit him here in the leg, and he ran up on deck and made a noise. I was looking around there for some place to run into and hide, as the captain was coming down there into the galley, and I was standing in the middle of the floor of the galley, facing the galley dresser. He struck me in the side here, and that sent me right on top the red-hot stove, on top the pots and pans. He commenced to curse me and threaten me and everything, and I pleaded to him. I says, 'Captain, don't hurt me; don't hurt me, Captain.' He looked at the axe, and he looked up through the slide. There is a little slide in the galley. He saw John Lind standing on top there, and he looked at me; he says, 'You whore's son,' he says, 'I will have the heart out of you.' And there he left me standing. I had cut them two fingers into my knuckles. The mate came along, and it was my last hopes in that vessel to see maybe another day; I had been sleeping in the galley for a week; I didn't know whether I would live to see the next day or not, so I turned to the mate, with tears rolling down my cheeks, and I said to him, 'Mr. Saunders,' I says, 'won't you protect me until we get into port?' He turned around to me with scorn. He says, 'Go to hell,' he says, 'you will get killed anyhow.' Then I did not know what I was doing. My mind was in that condition I didn't know whether to run overboard or to stay there and go and hide. I didn't know what to do. So I went up in the galley slide and looked around to see if I could see any vessel. Then I made up my mind if I should see any vessel I should take a board and jump overboard. So there I was. My basket of dishes was standing upon the dresser, all dirty, after breakfast, and I was washing them, and I saw at

tained though the particular objection under consideration was not commented on. The indictment in this case was evidently drawn from that, and charged that Andersen assaulted Saunders with a pistol with intent to kill him, by the

---

the time it was twenty-five minutes to ten then. I looked around, and I didn't know if I had washed my dishes at all. Of course I was completely out of my head then, so I thought about the cabin. Now, I used to sweep that cabin every morning and dust it and everything before nine o'clock. I used to have my dishes done in the galley before this time, and I had my dinner to have ready before twelve o'clock. So I started into the cabin, thinking that the captain would be on deck, and I came down in the cabin. He was sitting inside of the door in a chair like this, although bigger, and he had a bottle on this here lounge which was alongside of the stool or the chair. He glared at me and he looked fairly black in the face with rage. He blurted out and cursed me when I came into the cabin. Well, I didn't know what to do. If I should run on deck, I would have to run overboard; that was the only way I have to see out of it. I commenced sweeping the cabin and started into the mate's room first. I saw the mate's gun lying on the shelf, and I took that down, thinking if worst come to worst, I will have to defend myself. So I finished the cabin and started into the captain's room. I passed by him in that direction [indicating by gesture], and he took up that bottle like this. He says, 'You whore's son!' Then he took it up like this as if to split my head open, when I pulled my gun out and fired. The bullet struck him in the left temple. He fell into the chair, and I ran into the captain's room. Then I thought about the mate. I ran into the captain's room then and got his two guns. He used to keep one gun in under the pillow and one on the shelf. I ran up on deck and I didn't know where the mate was then. I came up to John Lind and he was at the main rigging. I says, 'Where is the mate?' He says, 'He is aloft.' I looked up there, and I think I said something of calling him down, but I don't think I did do that. The mate came down, and before he came down to the ————, piece next to the rail, he says, 'Where in the h—ll did you get them guns?' He says, 'And where is the captain?' I never made no answer to him, but I stayed on top of that house there as the mate came down, and he had this marlin spike around his neck. I will just show you how he had it, if you please. He had this hitch on this marlin spike, as represented to you before. He came down like this and walked up like this [indicating by appropriate gestures] (walking towards the bowsprit) and turned in this direction (to the right) and came towards me in that direction (on the starboard side). He took the half hitch out of the marlin spike like this, and the marlin spike was hanging down when he came towards me. I was standing there and had the guns then. I had three of them and I held them in my hand all the time. I had an apron around my waist, and I had no pockets here in the pants. He got this hitch off the marlin spike and came around to me like this [indicating by proper gesture]

discharge of which he inflicted on him "several grievous, dangerous and mortal wounds," and that he did "cast and throw from and out of the said vessel into the sea and plunge, sink and drown him, the said William Wallace Saunders, sometimes called William Saunders, in the sea aforesaid, of which said mortal wounds, casting, throwing, plunging, sink-

---

to take the marlin spike off his neck and shove the marlin spike into me. I pulled the gun and shot him. The first shot struck him here somewhere (in the side). He was still coming towards me, and I shot twice or three times together, when the man fell dead. In the meantime John Lind has been running into the lee side of the house. Now, he stated here yesterday to you gentlemen that I came up to him and says, 'Now the mate will go, too.' But that belongs on the lee side of the house; to that man. When he came there he told them, 'Now the mate will go, too.'

"Q. You mean by that that you didn't say it at all?

"A. No, sir. That belongs to John Lind and into the lee side of the forecastle; that is where that belongs. So I stood there, and John Lind — he was the man that came up first, and there was nobody else came up — so I says, 'Men,' I says, 'ain't you coming up?' I says. In the condition I felt, I felt actually frightened of the men the way I was, because I was completely gone. We throwed the mate overboard. I helped them also, so far as I can remember. And we took the captain out of the cabin and threw him overboard. And now, when this was done, I told them, I says, 'Now, men,' I says, 'you can do as you like with me,' I says; 'you can put me in irons and take into port and give me up. You see I had to defend my own life.' 'Yes,' they says, 'we all know that.' There I was, broke down completely, like a child, and here they are, coming up here yesterday to put everything onto me."

He also gave an account of the burning of the vessel and trip to the shore. On cross-examination he admitted that he was about three feet from the mate when he shot him; that he was standing on the forecastle house and the mate was down on the forecastle head; that the mate asked him not to shoot. As soon as he had killed the captain, what came into his head then was the mate; that he got the captain's pistols; that he ran up on deck through the pilot house where Barstad was and to Lind, who stood amidships, and asked where the mate was; that Lind told him the mate was aloft; that he got on top of the forecastle house, and in the excitement may have called him down. He denied having asked the men to throw the mate's body overboard, but admitted that he asked them to throw the captain's body overboard. He denied asking the crew to take a drink, but admitted that he may have got the whiskey. He denied ordering the vessel to be burned, and said that it was the engineer's suggestion. He admitted that he took the captain's watch and sold it and that the compass was thrown overboard before they reached the beach.

ing and drowning" Saunders "then and there instantly died." And it was further said, as in the indictment against St. Clair, that by reason of the casting and throwing of Saunders into the sea as aforesaid, the grand jurors "could not describe the said mortal wounds with greater particularity."

In *Commonwealth* v. *Webster*, 5 Cush. 295, the first count charged an assault and a mortal wound by stabbing with a knife; the second, by a blow on the head with a hammer; and the third, by striking, kicking, beating and throwing on the ground. The fourth count charged that the defendant feloniously, wilfully and of his malice aforethought, deprived the deceased of life " in some way and manner, and by some means, instruments and weapons to the jurors unknown." The Supreme Judicial Court of Massachusetts was unanimously of opinion that the latter was a good count. The court, speaking through Chief Justice Shaw, said : " From the necessity of the case, we think it must be so, because cases may be imagined where the death is proved, and even where remains of the deceased are discovered and identified, and yet they may afford no certain evidence of the form in which the death was occasioned; and then we think it is proper for the jury to say that it is by means to them unknown. . . . The rules of law require the grand jury to state their charge with as much certainty as the circumstances of the case will permit; and, if the circumstances will not permit a fuller and more precise statement of the mode in which the death is occasioned, this count conforms to the rules of law." In explaining the indictment and the setting out of several modes of death, the Chief Justice also said : " Take the instance of a murder at sea ; a man is struck down, lies some time on the deck insensible, and in that condition is thrown overboard. The evidence proves the certainty of a homicide by the blow, or by the drowning, but leaves it uncertain by which. That would be a fit case for several counts, charging a death by a blow, and a death by drowning, and perhaps a third alleging a death by the joint result of both causes combined."

*Commonwealth* v. *Desmarteau*, 16 Gray, 1, was an indict-

ment for murder, containing three counts. The first charged that the murder was committed by casting, throwing and pushing the deceased into the Connecticut River, and so choking, suffocating and drowning her; the second, that the death was caused by the blows of some weapon or instrument to the jurors unknown; the third, that the death was caused by the blows and drowning both. It was held that all the counts were in proper legal form and related to a single offence, and that as a conviction on any one required the same judgment and the same sentence as a conviction on all, the jury were properly instructed that if they found the prisoner guilty of the murder as set forth in either, they might return a verdict of guilty, generally.

So an indictment which alleged that death was caused by a wounding, an exposure and a starving, was held in *Commonwealth* v. *Macloon*, 101 Mass. 1, not to be bad for duplicity, and it was ruled that it was sufficient to allege that the death resulted from all these means, and to prove that it resulted from all or any of them.

And see *Joy* v. *State*, 14 Indiana, 139; *Woodford* v. *People*, 62 N. Y. 117; *State* v. *Fox*, 1 Dutcher, (25 N. J. L.) 566, 601; *State* v. *Johnson*, 10 La. Ann. 456; *People* v. *Colt*, 3 Hill, 432; *Jones* v. *Georgia*, 65 Georgia, 621; *Rodgers* v. *State*, 50 Alabama, 102; *Gonzales* v. *State*, 5 Tex. App. 584.

In our opinion the indictment was not objectionable on the ground of duplicity or uncertainty.

Granting that death could not occur from shooting and drowning at the same identical instant, yet the charge that it ensued from both involved no repugnancy in the pleading. For the indictment charged the transaction as continuous, and that two lethal means were employed coöperatively by the accused to accomplish his murderous intent, and whether the vital spark had fled before the riddled body struck the water, or lingered until extinguished by the waves, was immaterial.

If the mate had been shot in the rigging and fallen thence into the sea, an indictment alleging death by shooting and drowning would have been sustainable.

The Government was not required to make the charge in

the alternative in separate counts. The mate was shot and his body immediately thrown overboard, and there was no doubt that, if not then dead, the sea completed what the pistol had begun.

2. The venire for the jury in this case was issued after the term began, and it is insisted that it does not appear that it was authorized by any order of court. This was a point not made below, and it appeared on the argument at bar that an order of court directing the jury to be summoned had been duly entered, but was omitted from the record because no question had been raised in that regard. A duly certified copy of that order being produced, counsel for plaintiff in error very properly waived the necessity of issuing a certiorari, on suggestion of diminution, to bring it up. This disposed of the objection as made.

On the trial plaintiff in error moved to quash the venire on the ground that it should have shown that the jurors were summoned for the trial of this particular case. The motion was overruled. The law did not require jurors necessarily to be summoned before the term began, nor the name of the particular person or persons to be tried to be inserted in the writ. This was the November term of the court, and the order was entered on the second day of December and the writ was issued on the sixth of that month, after the commencement of that term, and was in the usual form, directing the persons named to appear on a day named to serve as petit jurors at said term. So far as appears there was no irregularity in summoning and empanelling the jury, and no exception was taken to the jury as empanelled. The point was untenable.

3. One A. J. Hall testified for the Government that he built the "Olive Pecker" and had sailed her for seven years. He described the vessel, and in connection with his testimony certain diagrams and an oil painting of the vessel were introduced without objection. He testified, among other things, that with a deck load of lumber of a certain height and the vessel on the port tack a man in the wheelhouse could command a view of the port side. After he had given his testi-

mony counsel for plaintiff in error "moved to strike out all
testimony as to the condition of the vessel at the time of the
casualty." Counsel for the Government insisted that he had
asked the witness nothing about that, and the Circuit Judge
said: "The court does not understand that he has so testified.
Anything that would bear that construction as a matter of
course will be excluded from the jury. I think it is eminently
proper that the jury should understand the character of this
vessel. This man is familiar with it; he built it; he has com-
manded it. He is detailing to the jury nothing that took
place at the time of the alleged offence. He is giving the
general character and situation of the vessel, so that you may
understand it, which I think is eminently proper. As he was
not on the vessel at the time of this occurrence the court will
not permit him to testify about anything that took place
then." The ruling was correct. *Bram* v. *United States*, 168
U. S. 532, 568.

The witness was asked this question: "Is it customary in
loading vessels with a deck load of lumber to leave passage-
ways or stairways to go down in different parts of the vessel?"
He answered: "We most always do that when we can, when
the lumber comes right, but sometimes we have to go right
over it when we can't." He was then asked, "Are you or
not familiar with the deck load of the 'Olive Pecker' when
she sailed from Boston on the 20th of June?" He answered:
"No, I don't know anything about that."

Counsel now contends that defendant moved to strike out
the testimony as to what was customary, but the record con-
tains no such motion, and we think the reference must be to
the motion above mentioned, which was properly disposed of.

4. John Lind had testified, on cross-examination, that An-
dersen asked the mate: "'Won't you protect me until we get
to port?'" and that the mate said: "'Get to port! You will
get killed anyhow,' or something like that." The question
was then put: "How came he to ask the mate to protect
him?" He answered: "The captain was cussing and treat-
ing him badly." Objection was made by the District Attorney
on the ground that counsel had no right to go into any alterca-

tion between the accused and the captain, but counsel for the accused insisted that he might "ask what took place between the captain and Andersen that morning, whether the mate was present or not, and let the jury infer whether Andersen was alluding to that when he asked the mate for protection." The court ruled: "You may ask it. We want all the facts in the case, and if it is not relevant testimony, it will be excluded." The witness thereupon gave an account of the quarrel about the captain's dog. He was then asked: "Do you know of any other circumstances? Had this captain been brutal or inhuman to this cook in any other way?" This question was objected to on the ground "that the character of the captain and his treatment of the accused prior to this time was not an issue in this case, which was a trial for the killing of the mate, and was not a part of the *res gestæ* of this case." After argument, the court sustained the objection and excluded the question, and exception was taken. Counsel for plaintiff in error immediately remarked: "I mean by the interrogatories I am going to propound now to confine myself to that morning," and continued the cross-examination. The record makes it plain that all evidence offered as to what occurred that morning was admitted, and that what was excluded in this instance was evidence of the conduct of the captain prior to the day the mate was killed. And there was nothing to indicate that that antecedent conduct of the captain was so connected with the killing of the mate as to form part of the *res gestæ,* or that it could have any legitimate tendency to justify, excuse or mitigate the crime for the commission of which Andersen was on trial.

5. After the Government had closed its case in chief, defendant's counsel moved that a verdict of not guilty be directed, because the indictment charged that the mate met his death by drowning, whereas the proof showed that his death resulted from the pistol shots. There was no error in denying this motion.

We repeat that the indictment charged the death to have resulted from shooting and drowning, and that the fact was uncontroverted that the mate was shot and immediately

thrown into the sea. There was no examination to ascertain whether he was then dead or not. He was lying face down and was picked up and thrown overboard as ordered by the accused, according to the testimony for the Government. Lind and March believed he was dead. Horsburgh said he appeared so. Barstad was doubtful, and Barrial testified he told the cook he was alive.

So far as this motion was concerned it was enough that the evidence was not conclusive that he was killed by the pistol shots.

And, as already indicated, the Government was not required to make the charge in the alternative and elect to proceed in respect of one means of death rather than the other, where the murderous action was continuous.

6. Several of the errors assigned relate to the rulings of the court limiting the testimony to the transactions on the day of the homicide. These rulings were made on certain questions propounded to the accused. His counsel asked: "Now, I want to ask this question to the witness: I want you to detail, with truth, to the jury everything that occurred in reference to this business, from the time you shipped on the 16th day of June until you left the vessel on the 6th day of August?"

This was objected to, and after argument the court, through Goff, Circuit Judge, ruled as follows: "I have no objection to your having the accused commence in his own way and detail as to him is best, confining himself to the truth, just what took place there on the morning of that day, and without any assistance from you, but I cannot permit him to detail to the jury the incidents of the voyage from the time they left Boston in June, as I understand your question to indicate." Exception was taken. Counsel then proceeded: "Q. Did you ship on the 'Olive Pecker'? A. Yes, sir. Q. Did you have trouble with the captain?"

This was objected to, and the court said: "I must say, Mr. McIntosh, that I fail to see the pertinency of testimony as to a quarrel with the captain in June or in July. Suppose the mate was a party, the charge is that of killing Saunders in

August and the testimony is confined to that time. You can show, if you can, what was the feeling between the accused and the mate, and that it was such growing out of previous quarrels or threats by the mate to take the life of the accused, or anything in that line which would tend to explain the standing of the parties at the time of this occurrence. Now, anything that bears upon what had taken place, so far as the mate is concerned, can go before this jury." Exception was taken.

Counsel continued: "Q. You shipped on board the 'Olive Pecker' some time in June, 1897? A. Yes, sir. Q. Now state to the jury all that occurred between you and the mate during that time, including all the facts and circumstances attending the 6th of August?"

All that part of the question intended to elicit what occurred between the mate and the cook from the time they left Boston was objected to.

The court said: "The trouble, Mr. McIntosh, is this, in the present condition of the testimony of this witness it is hard to see the pertinency of it now, but I do not say that it may not be pertinent. You had better first let the witness detail the transactions of the 6th of August, and if anything is developed thereby which makes it pertinent to bring in previous incidents as tending to explain what took place on the 6th, it can come in." Exception was taken.

The accused was then asked: "Detail to the court and jury all the occurrences which took place on the morning of the 6th of August, 1897." Thereupon the accused gave his account of the transactions of that date, the trip to shore and the subsequent arrest. After he had concluded his counsel put this question: "Now state what trouble, if any, you had had with this mate previous to this occasion?" The question was objected to on the ground that the testimony of the witness should be confined to what occurred on the day of the homicide. After argument, Goff, J., delivered this opinion:

"The reason I suggested to counsel for the accused that the statement as to the occurrences relating to the killing of the mate should be stated as they took place on that day was that

the testimony might be confined to a certain limit.   Now, there is no doubt in the world that a party may protect his own life against the party assailing him.   If he believes that he is about to suffer harm from one who has attacked; if he bases that belief upon a previous threat; if he bases that upon previous personal encounters; if he bases that upon the known brutal character of the party, the law, out of tender consideration for the frailties of human nature, will permit him to act upon that belief and upon that understanding. But can we apply that in this case?   Now, we must look at the matter as it is before the jury, as it is presented by this witness.   The witness states that he had a controversy with the captain; that the captain was cruel to him; then, in that hour, he turned to the mate and advised with the mate; he asked the protection of the mate.   His conduct, at least, does not indicate that there was any feeling between him and the mate at that time.   If the testimony is admissible, it is upon the theory that it must tend to explain the situation as it then existed.   He had turned to the mate to ask his protection from the captain.   Now, if the mate had attacked him, it would be perfectly competent for Andersen to show that the mate, previous to this day, had threatened him or had been cruel to him.   We must look at the testimony as the witness has given it himself.   It was the witness who sought the mate, and not the mate who sought the witness.   I fail to see how a party can, under those circumstances, show, either by himself or by another, that he had had a controversy with the party he is about to attack, the day before or the week before, if he has had time to cool.   If there had been a controversy of that kind, even under any circumstances of that kind, it does not authorize the party to take the law into his own hands.   I must exclude the testimony and adhere to the intimation I gave some time ago, on another ruling, with reference to threats."

To this ruling exception was taken.  · Counsel then said:

"Now, in order that this matter may go down right, and in order that I may save the point, but without any disrespect to the court, I want to propound this question to the witness.

" Q.  I don't want you to answer this, Andersen, until the court passes upon it.  I want it to go down in the record.  I want to ask you whether on the day before you had had a difficulty with the mate, and, without provocation on your part, the mate had not attempted to throw you overboard?

"Mr. McIntosh.  I understand that your honor rules that I cannot ask that?

"The Court.  The question is improper and cannot be answered."

And to this, exception was taken.

The preliminary rulings of the court which required the incidents of August 6 to be given at the outset are not open to criticism.  The point to be considered is whether evidence of transactions previous to that day was admissible in the light of the testimony of the accused in respect of what passed on that day.  It will be perceived that no specific offer of proof was made.  But, assuming that counsel had offered to show by the accused that he had had trouble with the mate previously to August 6, and that the day before he had had a difficulty with him, and the mate, without provocation, had attempted to throw the accused overboard, would such testimony by the accused have been admissible in view of his own detailed account of the homicide and its surrounding circumstances?  On what legal principle could it have been held to have a tendency in justification, excuse or mitigation?

Andersen's story was that on the morning of August 6 he had a difficulty with the captain about the dog; that the captain cursed him, struck him and sent him on top the red-hot stove and the pots and pans; that he subsequently appealed to the mate for protection, and he treated the application with scorn and profanity; that some time afterwards he went to the cabin to sweep it, and that the captain glared at him and cursed him.  He commenced sweeping the cabin, and started into the mate's room first; saw the mate's gun lying on the shelf and took it down, thinking that if the worst came to the worst he would have to defend himself.  He finished the cabin and started into the captain's room; the captain arose and was about to assault him with a bottle and he shot him.

" *Then I thought about the mate.* I ran into the captain's room then and got his two guns." He ran up on deck; asked Lind where the mate was; was told he was aloft; looked up and saw him there, and called him down or waited for him. As the mate came down he asked Andersen where he got the guns and where the captain was, but Andersen made no answer to this, and stayed on top of the forecastle house. Then as he stood on the house with the pistols, and the mate was three feet below on the forecastle head, but coming towards witness as if "to take the marlin spike off his neck and shove the marlin spike into me," witness pulled his gun and shot him. He shot him several times — the mate begging him not to shoot. Immediately after that he called up the sailors and the body was thrown overboard.

It is true that a homicide committed in actual defence of life or limb is excusable if it appear that the slayer was acting under a reasonable belief that he was in imminent danger of death or great bodily harm from the deceased, and that his act in causing death was necessary in order to avoid the death or great bodily harm which was apparently imminent. But where there is manifestly no adequate or reasonable ground for such belief, or the slayer brings on the difficulty for the purpose of killing the deceased, or violation of law on his part is the reason of his expectation of an attack, the plea of self defence cannot avail. *Wallace v. United States,* 162 U. S. 466; *Allen v. United States,* 164 U. S. 492; *Addington v. United States,* 165 U. S. 184.

According to his own statement, Andersen, after he had shot the captain, thought about the mate, armed himself with the captain's pistols, went in search of his victim, and finding him aloft on the mainmast at work, called him down, or, seeing him coming down, awaited him, and shot him. He was not only the aggressor but the premeditated aggressor. The captain being dead, he knew the mate would assume command, and that it would be his duty to arrest him and take him ashore for trial. The imminent danger which threatened him was the danger of the gallows. The inference is irresistible that to avert that danger he killed the mate, cast the bodies into the

sea, burned the ship and took to the open boat. · There can be no pretence that he was acting under a reasonable belief that he was in imminent danger of death or great bodily harm at the hands of the mate. ·He testified, to be sure, that when he had armed himself, gone in search of the mate, and stood on the forecastle house ready to receive him, he thought the mate was going to use against him the marlin spike, which he had been using at his work in the rigging, and to protect himself against that marlin spike, swung around the neck of a man standing three feet below him, the accused shot him down while he was asking for his life. · It was, indeed, the duty of the mate to attack Andersen as he stood there with three pistols, fresh from the slaughter of the captain, and in open mutiny. But as the accused told his story he was not repelling violence, and if the mate attempted to make use of the marlin spike, it was simply in self defence.

The case as Andersen's testimony made it afforded no basis for the introduction of evidence of prior provocation, or even of injuries previously inflicted, for no overt act on the mate's part provoked the evil intent with which Andersen sought him out on this occasion. Such evidence would not have been relevant, in view of the circumstances, as tending either to make out self defence or to reduce the grade of the crime.

. We are not insensible to the suggestion that persons confined to the narrow limits of a small vessel, alone upon the sea, are placed in a situation where brutal conduct on the part of their superiors, from which there is then no possible escape, may possess special circumstances of aggravation. But that does not furnish ground for the particular sufferer from such conduct to take the law into his own hands, nor for the suspension of those general rules intended for the protection of all alike on land or sea.

7. Complaint is made because the court refused to allow a witness to testify as to the general reputation of the captain. If there had been any adequate basis for the contention that Andersen killed the mate in self defence, by reason of a reasonable belief in imminent danger from him, evidence of his character for ferocity, brutality and vindictiveness might have been

admissible. *Smith* v. *United States*, 161 U. S. 85. But, as the record stood, the character of the captain could have no legal bearing on the issue of the guilt of the accused of the murder of the mate.

8. Various instructions were asked on behalf of the defendant, as well as on behalf of the Government, which were, respectively, refused by the court, except so far as included in the instructions given. But the only ruling in this regard pressed on our attention is the alleged error of the court in instructing the jury as follows: "The other felonious homicide to which I called your attention, manslaughter, is the unlawful killing of a human being without malice, either express or implied. I find it to be my duty, gentlemen of the jury, to say to you that if the defendant has committed a felonious homicide, of which you are the only judges, there is nothing before you that reduces it below the grade of murder."

This instruction was similar to that given by Mr. Justice McKenna, then Circuit Judge, which was reviewed and approved in *Sparf* v. *United States*, 156 U. S. 51, 63. That case is decisive of this, for the evidence disclosed no ground whatever upon which the jury could properly have reached the conclusion that the defendant was only guilty of an offence included in the one charged, or of a mere attempt to commit the offence charged. The testimony of the accused did not develop the existence of any facts which operated in law to reduce the crime from murder to manslaughter.

The law, in recognition of the frailty of human nature, regards a homicide committed under the influence of sudden passion, or in hot blood produced by adequate cause, and before a reasonable time has elapsed for the blood to cool, as an offence of a less heinous character than murder. But if there be sufficient time for the passions to subside, and shaken reason to resume its sway, no such distinction can be entertained. And if the circumstances show a killing "with deliberate mind and formed design," — with comprehension of the act and determination to perform it, the elements of self defence being wanting, — the act is murder. Nor is the

presumption of malice negatived by previous provocation, having no causal connection with the murderous act, or separated from it by such an interval of time as gives reasonable opportunity for the access of fury to moderate. Kerr on Homicide, § 68, *et seq.;* 2 Bishop New Cr. L. § 673, *et seq.;* Whar. Cr. L. § 455, *et seq.;* and cases cited.

There is nothing in *Stevenson's case,* 162 U. S. 313, to the contrary. The doctrine of *Sparf's case* is there reaffirmed, that " the jury would not be justified in finding a verdict of manslaughter if there were no evidence upon which to base such a finding, and ·in that event the court would have the right to instruct the jury to that effect."

No other error assigned requires notice.

*Judgment affirmed.*

MR. JUSTICE MCKENNA dissented.